**FILED**
**May 22, 2026**
**10:11 AM(ET)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT MURFREESBORO

| | |
|---|---|
| **MICHAEL WRIGHT,** Employee, | **Docket No. 2025-50-2322** |
| v. | |
| **BOULDIN CORP.,** Employer, | **State File No. 64621-2024** |
| And | |
| **BUSINESSFIRST INSURANCE COMPANY,** Carrier, | **Judge Thomas Wyatt** |
| And | |
| **TROY HALEY, ADMINISTRATOR, TENNESSEE BUREAU OF WORKERS' COMPENSATION SUBSEQUENT INJURY AND VOCATIONAL RECOVERY FUND.** | |

## EXPEDITED HEARING ORDER

In a May 6, 2026 expedited hearing, Michael Wright sought medical and temporary partial disability benefits for a work-related, right-leg injury. Bouldin Corporation argued that a non-work-related, flesh-eating infection in Mr. Wright's left leg severed the work-relatedness of the requested benefits. It also raised Mr. Wright's alleged failure to respond to communications about light duty as a defense to the temporary disability benefits he seeks.

For the reasons below, the Court awards Mr. Wright medical benefits of pain management and treatment for post-traumatic stress disorder but denies treatment for the flesh-eating infection. Additional temporary partial disability benefits are also awarded.

1

## History of Claim

On September 12, 2024, Mr. Wright fell and "bounced" down a flight of stairs while fleeing pressurized steam and burning garbage that suddenly escaped from a machine at Bouldin. When he came to rest, he suffered six broken ribs and two broken bones in his right leg. One of the broken bones protruded from his leg, and his body was covered with burned garbage. He testified that he thought "it was all over" for him as the accident unfolded.

Dr. David Hunter Boyce surgically implanted a rod and screws to repair the broken leg. Mr. Wright was hospitalized for a month after surgery and received a psychiatric evaluation that recorded his reports of "frequent and often intense" "flashbacks" of the accident resulting in "restlessness, insomnia, and nightmares." The evaluating psychiatrist diagnosed him with "symptoms of [an] adjustment disorder with high risk of development of PTSD."

On October 8, Mr. Wright reported continuing severe right-leg and rib pain and flashbacks of the accident. The surgeon referred him for pain management and treatment of PTSD. Utilization review certified the reasonableness and necessity of the PTSD treatment, but not the pain management.

Bouldin offered a panel for PTSD from which Mr. Wright selected Dr. Keith Caruso; however, he never saw him. Mr. Wright testified that the case manager first said the company did not like his selection, and later, she claimed Dr. Caruso did not take workers' compensation. Mr. Wright requested a new panel, but said that the case manager insisted he select another physician from the first panel. He did not receive a new panel and has never undergone PTSD treatment.

Dr. Boyce also noted during the first post-surgery visit that an infection developed near the surgery staples in his right leg. Over the ensuing weeks, home physical therapists noted open sores, skin tears, scabbing, pitting edema, and inflamed skin on Mr. Wright's right shin.

In November, Dr. Boyce again noted that Mr. Wright was limited by flashbacks and had to use crutches to bear weight on his right leg. He was not ready to return to work. Notes of a December 3 visit again documented blisters and redness around the "right anterior leg" that were "widely separated from his surgical site" and "entirely similar to his prior [episodes of deep vein thrombosis.]" Mr. Wright had taken prescribed medication for the thrombosis for several years before going to work at Bouldin.

During a later December visit, Mr. Wright's right-leg infection was better. Dr. Boyce concluded that he could return to sedentary work with no lifting greater than 25 pounds. He estimated maximum medical improvement in six months.

Mr. Wright then flew to the Philippines to visit a friend, arriving on December 19. He testified that he took the trip because he was not getting help for his PTSD, needed to clear his mind, and intended to return home for his next doctor's appointment in six weeks. He testified that he told his supervisor at Bouldin he was going on the trip.

In the Philippines, Mr. Wright stayed at a private residence, saw the sights, and attended church. About a week into the trip, the swelling, burning, and blisters on his right leg returned and, 48 hours later, a flesh-eating condition called necrotizing fasciitis appeared in his left leg. He was hospitalized from January 27 until March 16 for numerous surgeries to remove tissue from his left leg.

The treating plastic surgeon in the Philippines diagnosed "severe soft tissue infection on both legs with the necrotizing fasciitis in his left leg." He added, "On investigation of his case, I found no definitive and causative etiology for his condition/diagnosis."[1]

While hospitalized in the Philippines, Mr. Wright learned about a termination letter from Bouldin. The letter stated that Bouldin terminated him because he failed to respond to repeated communications "to see if there is a light duty accommodation by which you could return to work." Mr. Wright denied receiving communications about returning to work.

He testified that Bouldin had three employees, one of whom was a secretary. His and the other operator's jobs could not be performed while sitting. He added that his PTSD would have kept him from working any job at Bouldin at that time.

David Britton, a non-employee safety contractor for Bouldin, appeared as company representative. He stated the principals at Bouldin told him that, before Mr. Wright left for the Philippines, they unsuccessfully tried several times to contact him about returning to work under restrictions. He admitted that he reached Mr. Wright by telephone in December 2024 to discuss medical treatment but did not

---

[1] He testified that an infectious disease physician in the Philippines told him the flesh-eating infection was transported from his right leg to the left through his blood. He did not present written documentation of this opinion.

discuss a return to work. Mr. Britton also testified that the principals at Bouldin told him that they received a special contract which would have provided a sit-down job for Mr. Wright from mid-November 2024 until the New Year.[2] Finally, he testified that he recommended Bouldin terminate Mr. Wright in early February 2025 after he searched Facebook and learned about Mr. Wright's trip to the Philippines and the flesh-eating infection.

Mr. Wright remained in the Philippines until September 2025 for treatment of his left leg. He saw Dr. Boyce in October and reported ongoing pain in both legs. Dr. Boyce concluded that the right-leg fractures had healed and that Mr. Wright might reach maximum medical improvement in two months. He also wrote that Mr. Wright had "necrotizing soft tissue infection [in the left leg] treated in another country [without a] definitively established connection to the right lower extremity." Dr. Boyce ordered physical therapy for gait training and strengthening of the right leg; pain management; and referral to a primary care physician for assessment of his mental-health needs, including PTSD.

Mr. Wright reported to Dr. Boyce in December that he never received authorization for the treatment ordered at the previous visit. In the notes from this visit, Dr. Boyce clarified he was not treating the left-leg conditions and again ordered physical therapy for persistent pain and tenderness around the fracture site. He also reordered a "PTSD evaluation *related to work injury of the right leg from 9/20/24*." (Emphasis added).

At a February 2026 visit, Dr. Boyce declined to reorder physical therapy due to "a gap in care." On each of the visits from December 2024 to February 2026, Dr. Boyce limited Mr. Wright to sedentary work with no lifting over ten or 25 pounds and no climbing.

Mr. Wright testified that his right leg still hurts. He continues to experience PTSD symptoms that he believes would keep him from returning to Bouldin even if he was physically able to work there.

Both sides offered reports from physicians performing independent examinations. Mr. Wright relied on Dr. Robert Landsberg, who concluded that he could not give an opinion about the work-relatedness of the flesh-eating infection because he did not know the infectious agents that invaded either of Mr. Wright's legs.

---

[2]Bouldin did not produce as witnesses the persons in its control that had direct information on this point.

4

Bouldin relied on the report of Dr. Jeffrey Hazlewood, who saw Mr. Wright once. He concluded that additional physical therapy and pain management are unnecessary because Mr. Wright's broken right leg has healed and his ongoing problems primarily relate to non-work-related deep-vein thrombosis and the flesh-eating virus in his left leg. He added that Mr. Wright does not require permanent restrictions from his right-leg condition. Finally, Dr. Hazlewood stated that a one-time assessment of Mr. Wright's need for PTSD treatment was reasonable, providing the assessment is by a psychiatrist.

Regarding the claim for temporary disability benefits, the parties stipulated that the applicable weekly compensation rate is $468.67, and Bouldin stopped paying temporary benefits on January 28, 2025. Mr. Wright testified that he has not worked since the accident. Dr. Boyce and Dr. Hazlewood placed Mr. Wright at maximum medical improvement on February 17, 2026, and February 2, 2026, respectively.

## Findings of Fact and Conclusions of Law

To recover at this expedited hearing, Mr. Wright must show that he will likely prevail at a final hearing on his requested benefits. Tenn. Code Ann. § 50-6-239(d)(1) (2025). During the hearing, he requested pain management, PTSD treatment, a panel for treatment of the flesh-eating infection, and temporary partial disability benefits.

### *Pain Management*

A foundational benefit of the workers' compensation law is that the employer "shall furnish, free of charge to the employee, such medical and surgical treatment, medicine . . . [and] psychological services as ordered by the attending physician[.]" *Id.* § 50-6-204(a)(1)(A). However, an employee's need for treatment is covered under workers' compensation only if the employee shows by medical expert testimony that it "arises primarily out of and in the course and scope of employment." *Id.* § 50-6-102(12). In other words, the employee must show that the employment contributed "more than fifty percent (50%) in causing the . . . need for treatment, considering all causes." *Id.* § 50-6-102(12)(C).

During the hearing, Mr. Wright testified credibly that he continues to suffer pain in the right leg he injured at Bouldin. Dr. Boyce accepted the legitimacy of his

5

report of right-leg pain in October 2025 and afterward by reordering pain management treatment, just as he did before Mr. Wright left for the Philippines. In December 2025, Dr. Boyce reiterated he had never undertaken treatment of the left-leg conditions and had ordered pain management for the right-leg injury.

Bouldin countered with Dr. Hazlewood's opinion that further treatment of Mr. Wright's right leg is: (1) medically unnecessary because the bones had healed and (2) not work-related because any pain he now endures is more than 50% causally related to his more serious, non-compensable left-leg conditions.

When confronted with opposing medical opinions, the trial judge shall conclude which opinion "contains the more probable explanation." *Ledford v. Mid Georgia Courier, Inc.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 28, at *7-8 (June 4, 2018). The Court may consider the qualifications of the experts, the circumstances of their evaluations, the information available to them, and an evaluation of the importance of the available information.

Here, both doctors are qualified. However, Dr. Boyce has much more context to determine the level and causation of Mr. Wright's current right-leg pain, since he performed surgery and has followed him clinically before and after the left-leg conditions arose. On the other hand, Dr. Hazlewood only saw Mr. Wright once.

Also, the methodologies employed by the physicians separate the usefulness of their opinions. Dr. Boyce assessed Mr. Wright's need for right-leg treatment independent of the conditions in his left leg. Dr. Hazlewood considered which of the two conditions causes more than 50% of Mr. Wright's total pain.

Dr. Boyce's methodology more closely aligns with the clear obligation under the law that employers pay for reasonable and necessary treatment of an employee's work injury. He determined on his first post-surgery visit that Mr. Wright's work-related, right-leg injury was painful and needed pain management. He maintained that opinion even after Mr. Wright contracted the flesh-eating infection.

On the other hand, Dr. Hazlewood assessed the work-relatedness of Dr. Boyce's pain-management order by comparing whether the work injury or the damage caused by the flesh-eating infection was worse. The Court finds this methodology is less helpful than that employed by Dr. Boyce. The unfortunate fact that Mr. Wright contracted the flesh-eating infection in his left leg does not negate Bouldin's obligation to provide medical treatment for his compensable right-leg injury, even if the pain from the left-leg condition is worse than that from the right-

leg injury.

For the reasons above, the Court finds that the opinion of the authorized surgeon—that Mr. Wright's work-related, right-leg injury is painful and needs treatment—best aligns with workers' compensation law. Also, his extensive treatment with Mr. Wright provides better context for resolving these issues. For those reasons, Mr. Wright will likely prevail at trial in showing that he is entitled to the pain management ordered by the authorized surgeon.

*PTSD Treatment*

All the medical evidence in this record supports the conclusion that Mr. Wright has long needed treatment and evaluation for PTSD symptoms. Dr. Boyce, a utilization review physician, and even Dr. Hazlewood all reached the same conclusion. Thus, Mr. Wright will likely prevail at trial in showing that he developed PTSD that is: (1) causally related to his work injury at Bouldin and (2) needs evaluation and treatment.

It is concerning that, a year and a half after his injury, Mr. Wright has received no treatment for PTSD. At the hearing, Bouldin failed to explain why it had not authorized PTSD treatment. It did not produce witnesses to rebut Mr. Wright's testimony that the carrier did not like the physician he selected from the panel and tried to steer him to another physician. It did not explain why it failed to follow the recommendation of its own doctor that Mr. Wright needed evaluation for PTSD symptoms.

Tennessee Code Annotated section 50-6-118(8) permits an administrative penalty when an employer fails to timely provide medical treatment recommended by the authorized treating physician. Here, Mr. Wright has not received the PTSD treatment prescribed a year and a half ago by the authorized surgeon. Thus, the Court refers this case to the Bureau's compliance unit for assessment of a penalty for the failure to timely authorize Mr. Wright's PTSD treatment.

*Infectious Disease Panel*

Mr. Wright's entitlement to a panel of infectious disease physicians rests on his ability to show by medical expert testimony that he will likely prevail at trial in proving the work-relatedness of the flesh-eating infection in his left leg. The record here is devoid of the requisite medical evidence. Dr. Boyce concluded that Mr. Wright's left-leg conditions are unrelated to his work-related, right-leg injury.

7

Neither independent physician established the causation of the left-leg infection.

Mr. Wright incorrectly argues that he has proven enough to require Bouldin to send him to an infectious disease physician for a causation analysis. Section 50-6-204 does not impose on employers the obligation to pay a physician to evaluate the causation of an employee's alleged injury and/or need for treatment. *Pool v. Jarmon D&Q Transport*, 2016 TN Wrk. Comp. App. Bd. LEXIS 1, at *9 (Jan. 4, 2016).

For the above reasons, the Court denies Mr. Wright's request for a panel of infectious disease physicians.

*Temporary Disability Benefits*

Mr. Wright argued that, since he has remained under restrictions for his compensable right-leg injury to the present, he is entitled to both accrued temporary partial disability benefits back to January 28, 2025, when Bouldin stopped paying, and on-going benefits. Bouldin countered that he lost his right to temporary disability benefits when he failed to communicate with them about returning to light duty work. Also, his non-work-related, flesh-eating infection severed the causation of any disability arising after the appearance of the infection.

Tennessee Code Annotated section 50-6-207(2) provides for the payment of benefits for each week of compensable temporary partial disability calculated at the rate of "sixty-six and two-thirds percent (66⅔%) of the difference between the average weekly wage of the worker at the time of the injury *and the wage the injured worker is able to earn in the worker's partially disabled condition*." (Emphasis added.) A work injury causes disablement "only if it has been shown to a reasonable degree of medical certainty that it contributed more than fifty percent (50%) in causing [the . . . disablement], considering all causes." *Id.* § 50-6-102(12)(C).

In *Jewell v. Cobble Construction,* 2015 TN. Wrk. Comp. App. Bd. LEXIS 1, at *22-23 (Jan. 12, 2015), the Appeals Board held that entitlement to temporary partial disability benefits occurs when, before attaining maximum medical improvement, the employee retains disability that is not total such that the employee might resume some gainful employment if available. In *Lasser v. Waste Management, Inc.,* TN Wrk. Comp. App. Bd LEXIS 20, at *21-22 (May 24, 2028), the Appeals Board stated that the issue of whether an employee failed to return to light duty turns on the reasonableness of the employer's offer of work and the employee's failure to return to work. In *Lasser,* the employee could not recover

temporary partial disability benefits when his failure to return to light duty was "purely personal."

Mr. Wright testified he received no communication about returning to work under restrictions. Bouldin countered Mr. Wright's testimony with that of Mr. Britton, who testified only about what the principals at Bouldin told him. Furthermore, the termination letter did not say that Bouldin had light duty available, but instead, charged Mr. Wright with failing to discuss if light duty was available.

Based on this evidence, Mr. Wright will likely prevail at trial in showing that he did not receive communications to contact Bouldin about returning to work.

The Court now moves to whether the non-work-related, flesh-eating infection in Mr. Wright's left leg severed the causation of the disablement that he endured after the infection arose. During all periods involved, Mr. Wright remained under partial disability by being limited to sedentary work with a lifting restriction. Thus, had the flesh-eating infection not arisen, Mr. Wright would likely prevail at trial in proving entitlement to temporary partial disability benefits.

But beginning in late January 2025, the flesh-eating infection did appear. Until March 16, he remained in a hospital in the Philippines for this condition. During the hospitalization, Mr. Wright was disabled from working by a non-work-related condition. Thus, he will not likely prevail in showing his entitlement to temporary partial disability benefits from January 28 to March 16, 2025, while he was hospitalized.

Mr. Wright's claim for temporary partial disability benefits after March 16, 2025, presents a close issue. The medical evidence on the disabling effect of the flesh-eating infection is not well-developed. Mr. Wright says he endures pain from the conditions in both legs. Dr. Boyce has continued Mr. Wright under sedentary and lifting restrictions due to his work-related injury, while Dr. Hazlewood placed no restrictions due to the right leg and believes any current pain and need for treatment suffered by Mr. Wright relates to his left-leg conditions. For the reasons discussed above distinguishing the usefulness of Drs. Boyce's and Hazlewood's opinions, the Court finds that Dr. Boyce's placement of restrictions based on the right-leg condition presents the most probable explanation for Mr. Wright's disablement from March 16, 2025, to the present.

Based on the above, Mr. Wright will likely prevail at trial in showing his entitlement to temporary partial disability benefits from March 16, 2025, until

9

February 17, 2026, the date on which Dr. Boyce placed him at maximum medical improvement. Thus, the Court awards Mr. Wright $22,696.05 in temporary partial disability benefits (339 days at $66.95 per day.)

**IT IS, THEREFORE, ORDERED** as follows:.

1. Bouldin shall promptly authorize pain management and PTSD treatment and pay $22,696.05 in temporary partial disability benefits.

2. The Court refers this case to the Bureau's compliance unit for assessment of an administrative penalty for Bouldin's failure to timely authorize PTSD treatment ordered by Dr. Boyce and certified by utilization review.

3. The Court approves an attorney's fee of 20% of the award of temporary partial disability benefits to Steve Waldron, counsel for Mr. Wright.

4. The Court sets a telephone status hearing **on August 21, 2026, at 9:00 a.m. Central Time/10:00 a.m. Eastern Time**.

**ENTERED May 22, 2026.**

**JUDGE THOMAS WYATT**
**Court of Workers' Compensation Claims**

**APPENDIX**

The technical record consists of all documents filed on the TNComp electronic filing system, which the Court will consider in reaching its decision.

*Exhibits:*

1. Rule 72 declaration of Michael Wright
2. Photograph
3. Wage Statement
4. Employee's compilation of medical records

5. Employer's compilation of medical records
6. Choice of Physician form—PTSD
7. Intake form—Dr. Caruso
8. Utilization review documents—Claims Eval
9. Restrictions and pain management referral form—Dr. Boyce
10. Additional records—Dr. Boyce
11. Termination communications

## CERTIFICATE OF SERVICE

I certify that a copy of this order was sent as shown on May 22, 2026.

| Name | Mail | Email | Service sent to: |
|---|---|---|---|
| R. Steven Waldron, Employee's Attorney | | X | arlenesmith@wfptnlaw.com |
| Nick Peterson, Ashley Dilly, Employer's Attorneys | | X | Nick.peterson@petersonwhite.com<br>Ashley.dilly@petersonwhite.com |
| Laurenn Disspayne, Attorney for TN Subsequent Injury Fund | | X | Laurenn.disspayne@tn.gov |

_____

**PENNY SHRUM, COURT CLERK**
**wc.courtclerk@tn.gov**



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board.  To do so, you must:

1.  Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
    ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
    ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
    When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2.  You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal.  Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service.  In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee.  You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal.  **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3.  You are responsible for ensuring a complete record is presented on appeal.  If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee.  If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk.  The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted.  For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4.  After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

    **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable.  See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

### Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*